RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 3 / 2 / 12

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

VERONICA MICHELLE ELDER,          CIVIL ACTION
      Appellant                   1:11-CV-00631

VERSUS

U.S. COMMISSIONER OF SOCIAL       JUDGE JAMES T. TRIMBLE
SECURITY,                         MAGISTRATE JUDGE JAMES D. KIRK
      Appellee

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Veronica Michelle Elder ("Elder") filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on November 26, 2008, alleging a disability onset date of April 1, 2006 (Tr. pp. 87, 92) due to diabetes and kidney problems (Tr. p. 121). Those applications were denied (Tr. pp. 66, 70).

A de novo hearing was held before the administrative law judge ("ALJ") on January 11, 2010, at which Elder appeared with a vocational expert ("VE") (Tr. p. 27). The ALJ found that, although Elder suffers from diabetes, neuropathy, cataracts, and acute renal failure (Tr. p. 18), she has the residual functional capacity to perform light work except for work requiring frequent use of near and far visual acuity (Tr. p. 19), and can work as a bagger, cleaner/housekeeper, or fast food worker (Tr. p. 23). The ALJ concluded that Elder was not disabled at any time through the date of his opinion on February 26, 2010 (Tr. p. 23).

Elder requested a review of the ALJ's decision, but the

Appeals Council declined to review it (Tr. p. 1) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Elder next filed this appeal for judicial review of the Commissioner's final decision. Elder raises the following grounds for judicial review (Doc. 14):

> 1. The ALJ did not adequately address the evidence that satisfies Listings 5.05D, 5.06A, 6.02C, 9.08A, and 9.08C of Appendix 1. Accordingly, the ALJ failed to properly analyze the listed impairments for which the claimant qualifies and did not provide a sufficient explanation as to how he reached the conclusion that the evidence fails to satisfy any listed impairment.
>
> 2. The ALJ failed to properly develop the record for a claimant who was not represented at the hearing level.
>
> 3. The claimant's allegations were improperly rejected without a proper assessment of credibility as required by the regulations.

The Commissioner filed a brief in response to Elder's appeal (Doc. 15), to which Elder filed a reply (Doc. 16). Elder's appeal is now before the court for disposition.

### Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful

employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

1. Medical Records

In December 2002, when she was 25 years old, Elder was treated for uncontrolled Type II diabetes; it was noted that her vision was blurry, she was losing weight, and she had no energy (Tr. p. 186). A thyroid ultrasound in April 2003 showed an enlarged right lobe with two nodules (Tr. pp. 184-185).

In June through October 2005, Elder was treated for uncontrolled diabetes mellitus, type II, by Dr. Gregory S. Bevels (Tr. pp. 192-201).

In May 2006, Elder was evaluated by Dr. Bernard Patty, an ophthalmologist, for sudden loss of vision in her right eye and a

3

more gradual decrease in left eye vision (Tr. p. 205). Dr. Patty found a right eye cataract caused by diabetes and recommended strabismus surgery (Tr. pp. 206-207). Elder's right cataract was later removed (Tr. p. 268).

In July 2007, Elder was treated for hyperglycemia due to uncontrolled diabetes mellitus; she admitted she had not been taking her medication (Tr. pp. 260, 586). Elder was placed on a low salt diet, and prescribed Lisinopril for her hypertension and neurontin for peripheral neuropathy (Tr. pp. 260, 584). In August 2007, Elder reported fatigue, frequent urination, leg pain, and bowel problems, admitted she had not been taking her insulin, and needed a refill on her Glucophage and insulin (Tr. pp. 258, 582-583). Elder was 5' tall and weighed 121 pounds (Tr. pp. 258, 582). Elder returned in September 2007 with the same symptoms plus increased thirst, again admitted non-compliance with medication, and was diagnosed with diabetes mellitus with hyperglycemia (Tr. p. 241-254).

In November 2007, Elder went to the emergency room for high blood sugar, weight loss, weakness, dizziness, and difficulty urinating (Tr. pp. 281, 283, 574). She was 5' tall and weighed 114 pounds (Tr. p. 281). A CT scan of her abdomen and chest and abdominal x-rays were essentially negative, but her glucose was high (Tr. p. 286, 288-289, 293, 295, 305-308). Elder was diagnosed with diabetes mellitus (Tr. p. 283) and prescribed a high fiber, diabetic diet (Tr. p. 287).

In January 2008, Elder again reported difficulty urinating,

4

polyphagia (excessive appetite), polydipsia (excessive thirst), and
not taking her insulin for at least a month (Tr. p. 268). Elder
had high glucose levels, was noted to have a left eye cataract, and
was given prescriptions (Tr. p. 270).

In June 2008, Elder was treated for uncontrolled diabetes type
II, a neurogenic bladder, a cataract, hyperglycemia, bilateral
hydronephrosis,[1] and hydroureter[2] (Tr. pp. 405-406, 410, 557-562).
Elder was 5' tall, weighed 104 pounds, her blood pressure was
116/97, and she reported losing 30 pounds in the last year and 205
pounds since 2004 (Tr. pp. 405, 560). Elder stated she had reduced
her tobacco use from half a pack a day for ten years to 5
cigarettes a day for the last few months, and did not use alcohol
or drugs (Tr. pp. 405, 560). Elder was treated with in-and-out
catheters, was instructed to keep a log of her blood sugars, and
was prescribed insulin and medication for her urination
difficulties (Tr. p. 405-406).

Elder was again treated for hyperglycemia in September 2008
(Tr. p. 554). On October 20, 2008, Elder was evaluated at the

---

[1] Hydronephrosis is the cystic distension of the kidney
caused by the accumulation of urine in the renal pelvis as a
result of obstruction to outflow and accompanied by atrophy of
the kidney structure and cyst formation. MEDLINEplus Health
Information, Merriam-Webster Medical Dictionary: Hydronephrosis,
available at http://www.nlm.nih.gov/mplusdictionary.html (a
service of the U.S. National Library of Medicine and the National
Institutes of Health).

[2] Hydroureter is abnormal distension of the ureter with
urine. MEDLINEplus Health Information, Merriam-Webster Medical
Dictionary: Hydroureter, available at
http://www.nlm.nih.gov/mplusdictionary.html (a service of the
U.S. National Library of Medicine and the National Institutes of
Health).

5

urology clinic for difficulty urinating; Elder was diagnosed with uropathy (disease of the urinary organs) and a Foley catheter was inserted (Tr. pp. 237-240, 360-361). Elder was also diagnosed as having nonketotic hyperosmolar[3] syndrome with acute renal failure, as well as diabetes mellitus and scabies (Tr. pp. 236, 363-364, 531, 543), markedly severe hydronephrosis, and marked wall thickening of the urinary bladder (Tr. pp. 399-402). Elder was further diagnosed with major depression with psychotic features and prescribed an antidepressant (Tr. p. 367).

On November 7, 2008, Elder was again diagnosed with hyperglycemia and stated she had not been taking her medication (Tr. pp. 313-314). A cytopathology consultation showed papillary groups of atypical urothelial cells and numerous acute inflammatory cells in Elder's urine (Tr. p. 316). Radiology exams of Elder's abdomen and pelvis showed longstanding right-sided hydronephrosis with development of multiple abnormal areas within the right kidney, and anasarca[4] with bilateral pleural effusions and moderate free pelvic fluid (Tr. pp. 350). A CT scan on November 11, 2008

---

[3] Hyperosmolarity is the condition especially of a bodily fluid of having abnormally high osmolarity. Hyperosmolarity occurs in dehydration, uremia, and hyperglycemia with or without ketoacidosis. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Hyperosmolarity, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[4] Anasarca is generalized edema with accumulation of serum in the connective tissues. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Anasarca, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

showed the urinary stent and nephrostomy tube in place in the right kidney with a decrease in hydronephrosis (Tr. p. 355). A radiology report on November 12, 2008 confirmed severe dilatation of Elder's ureter and the renal cavities, as well as multiple focal lesions on the right kidney consistent with suspected abscesses and possible necrotizing[5] papillitis[6] (Tr. p. 354). A percutaneous nephrostomy with catheterization was performed on November 26, 2008, and it was noted that she had been admitted with diabetic ketoacidosis and a urinary tract infection and that her recent CT scan of her abdomen and pelvis showed multiple abscesses on the right kidney, which was also hydronephrotic (Tr. pp. 351-352). The nephrostomy tube was supposed to be removed a few days later, on November 21, 2008, but was left in place because a hydraulic test had not been performed (Tr. pp. 356-357). Elder had urine retention again in December 2008 (Tr. pp. 231-232).

In January 2009, a residual functional capacity assessment of Elder was made by a non-examining consultant, Dr. Timothy Honigman, a pediatrician, based on a review of Elder's medical records (Tr.

---

[5] Necrotizing is causing, or associated with, or undergoing necrosis, or death of living tissue. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Necrotizing, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[6] Papillitis is inflammation of a papilla (a small projecting body part similar to a nipple in form). MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Papillitis, Papilla, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

pp. 429-436). Dr. Honigman found Elder can lift twenty pounds occasionally and ten pounds frequently, stand or walk up to six hours in an eight hour day, sit up to six hours in an eight hour day, do unlimited pushing and pulling with hands and feet, climb stairs frequently but only occasionally climb a ladder or scaffold, balance, stoop, kneel, crouch, or crawl, and has no limitations in manipulation, vision, communication, and environment (Tr. pp. 430-436).

In March 2009, Elder was 5' 1" tall and weighed 98 pounds (Tr. p. 703). Elder was diagnosed with a urinary obstruction, urinary tract infection, hyperglycemia, and renal insufficiency (Tr. pp. 696-701).

In November 2009, Elder was admitted to the hospital with acute renal failure, nausea and vomiting, and her blood pressure was 160/100 (Tr. pp. 454-456, 687, 690-691). Elder was discharged with an indwelling Foley catheter and improved renal function (Tr. p. 687). Elder was treated for elevated blood sugar in December 2009 and diagnosed with diabetic ketoacidosis (Tr. pp. 439, 441, 480-486, 685).

In March 2010, it was noted that Elder had been using catheter drainage for about two years (Tr. p. 682). Elder weighed 120 pounds (Tr. p. 679), and reported she had quit smoking tobacco that year (Tr. p. 676). Elder was again diagnosed with diabetic ketoacidosis, brittle (or unstable) diabetes, neurogenic bladder, diabetic neuropathy, and acute renal insufficiency (Tr. p. 680). Since Elder's renal failure is chronic, and was stabilized at that

8

time, she was discharged for urological follow-up (Tr. p. 680). In April 2010, Elder was diagnosed with cholelithiasis (gallstones) (Tr. p. 672) and a kidney stone (Tr. p. 667), neither of which was acute, and she was advised to discontinue taking Lortab (Tr. pp. 508-509).

In June 2010, Elder was again treated for hyperglycemia, dehydration, and urinary tract infection (Tr. pp. 502-507).

### 2. Administrative Hearing

An administrative hearing was held in January 2010, at which Elder appeared alone and stated she wanted to proceed without counsel (Tr. p. 30).

Elder has a GED and is a certified nursing assistant (Tr. p. 43). Elder worked as a CNA in a nursing home for about six years, and also had a second job as a shift manager for productive work (cooking and cleaning) at Burger King for about five years (Tr. pp. 44, 129). Elder testified she can no longer work at the nursing home because she has a wear a catheter, so she cannot push and pull (Tr. p. 45).

Elder testified she was 32 years old, was 5' 1" tall and weighed about 130 pounds (Tr p. 32). Elder testified she used to weigh 311 pounds, and she started losing weight in 2004 because of her diabetes (Tr. pp. 32-34). Elder testified that her diabetes caused the weight loss, and that she lost muscle as well as fat, and it also caused nerve damage, or neuropathy, in her feet and legs (Tr. p. 34).

Elder testified she was divorced, her eighteen year old helped

her at home, and her other children lived with their father (Tr. p. 34).  Elder testified that she is right handed and has a driver's license but does not drive due to a cataract (Tr. p. 35).

Elder testified she takes insulin (Novolog) three times a day with her meals and also at bedtime, and takes Lortab as needed for pain (Tr. p. 35).  Elder testified that when she was given Lyrica and Neurontin, she began to hallucinate, so she stopped taking those medications and just takes a pain pill if she needs it because she does not like the way they make her feel (Tr. p. 36).

Elder testified her legs are always in "excruciating pain" (tr. p. 37).  Elder testified her toes are so tender no one can touch them, her legs hurt so much she cannot even run lotion onto them, her legs hurt up to her knees, and she feels like her veins are burning (Tr. p. 37).  Elder's legs give out sometimes, causing her to fall (Tr. p. 37).  Elder testified she usually wears little socks with Keds tennis shoes (Tr. p. 38).  Elder also testified she uses insulin pens, but when she becomes more stable and is on a schedule, her doctor may put her on an insulin pump (Tr. p. 45).

Elder testified she was in the hospital for her diabetes for nine days in December and, eight days in about November, and she spent a lot of 2009 in the hospital (Tr. p. 36).  Elder had a catheter from October 2008 through May 2009, when it was removed, but it was replaced a few months later (Tr. p. 37).

Elder testified her vision was last tested in about 2008; Elder testified there was a cataract in her left eye which was removed, and there is another cataract in her right eye which

10

blinds her in that eye (Tr. pp. 38-39). Elder also testified that her vision is worse if her blood sugar is high (Tr. p. 39). Elder testified her vision problems affect her lifestyle, such as not being able to cook much (Tr. pp. 39-40). Elder stated she an appointment to have her vision tested again in January 2010 at the Wallace Eye Center (Tr. p. 40).

Elder testified that she can bathe and dress herself, but she worries about falling when she is alone in the house (Tr. p. 40).

Elder testified that, on a good day, she gets up, has a cup of coffee, eats breakfast, takes a bath, dresses, and does things around the house (Tr. pp. 40-41). On a bad day, when she is in a lot of pain, Elder stays in bed (Tr. p. 41). Elder testified that she gets depressed and is currently "homeless" (Tr. p. 41); Elder testified that she and her eighteen year old son live with her sister (Tr. p. 42).

Elder testified that she can walk about two blocks without stopping (Tr. p. 45), she can lift a gallon of water (Tr. p. 46), and she can stand for about thirty minutes (Tr. pp. 46-47).

The VE testified that Elder's past relevant work as a fast food cook was skilled, medium level work (Tr. p. 48), and that her past work as a CNA was semi-skilled, medium level work (Tr. p. 48).

The ALJ posed a hypothetical to the VE which concerned a person of Elder's age, education, and work experience, who can lift twenty pounds occasionally and ten pounds frequently, stand and/or walk up to six hours in an eight hour day, sit up to six hours in

an eight hour day with normal breaks, and would have "infrequent"[7]
use of near and far visual acuity (Tr. pp. 48-49). The VE
testified that such a person could not perform Elder's past
relevant work (Tr. p. 49), but could work as a laundry bagger
(light, unskilled, DOT 920.687-018, 225,406 jobs in the nation and
1464 jobs in Louisiana), a cleaner in housekeeping (light,
unskilled, DOT 323.687-014, 445,503 jobs in the nation and 6832
jobs in Louisiana), or a fast food worker[8] (light, unskilled, DOT
311.472-010, and 398,599 jobs in the nation and 5169 jobs in
Louisiana) (Tr. pp. 49-50).

## ALJ's Findings

To determine disability, the ALJ applied the sequential
process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R.
§416.920(a). The sequential process required the ALJ to determine
whether Elder (1) is presently working; (2) has a severe
impairment; (3) has an impairment listed in or medically equivalent
to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4)

---

[7] The transcript states "would have only frequent use of
near and far visual acuity" (Tr. p. 49), but that is obviously an
error by the transcriber and proofreader since it does not make
sense. The undersigned has little doubt the ALJ actually said
"would have infrequent use of near and far visual acuity," given
Elder's vision problems and the fact that the ALJ was listing
limitations.
It is noted that "infrequent use" of both near and far
visual acuity appears to eliminate use of eyesight. It is not
clear what job does not require frequent use of all eyesight; the
VE does not appear to have taken this limitation into account.

[8] It is noted that no distinction was made between the VE's
light duty fast food worker job and the medium duty fast food
worker job (shift supervisor, cooking, cleaning) Elder performed
at Burger King, nor was it explained at the hearing whether fast
food employers make that type of distinction.

is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Elder has not engaged in substantial gainful activity since April 1, 2006, that her disability insured status expires on September 30, 2012, and that she has severe impairments of diabetes, neuropathy, cataracts, and acute renal failure, but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 18).  The ALJ also found that Elder is unable to perform her past relevant work as a fast food cook and a certified nursing assistant (Tr. p. 22).

At Step No. 5 of the sequential process, the ALJ further found

that Elder has the residual functional capacity to perform the full range of light work except as reduced by her vision loss from cataracts (Tr. p. 21). The ALJ found that the claimant is a younger individual with at least a high school education and that transferability of work skills is immaterial (Tr. pp. 22). The ALJ concluded there are a significant number of jobs in the national economy which Elder can perform, such as bagger, cleaner/housekeeper, and fast food worker[9] (Tr. p. 23) and, therefore, Elder was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on February 26, 2010.

<u>Scope of Review</u>

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994), citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence

---

[9] As noted above, this finding appears to contradict the earlier finding that Elder can no longer perform her past relevant work as a fast food worker/cook.

which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## Law and Analysis

### Issues 1 & 2 - Listings and Development of Record

First, Elder contends the ALJ did not adequately address the evidence which satisfies Listings 5.05D, 5.06A, 6.02C, 9.08A, and 9.08C of Appendix 1. Elder argues the ALJ failed to properly analyze the listed impairments for which the claimant qualifies and

15

did not provide a sufficient explanation as to how he reached the conclusion that the evidence fails to satisfy any listed impairment. Elder further argues the ALJ failed to properly develop the record for a claimant who was not represented at the hearing level.

The ALJ stated in his decision, "The claimant, who is unrepresented in this matter, has advanced no argument that she has a condition which meets or equals the requirements of a listed impairment. Nor is it apparent on the fact of the medical records that the claimant has such an impairment. The claimant has failed to meet the burden of proof at this step of the process, and the undersigned finds that she has no impairment which meets or equals the requirement of a listed impairment."

The ALJ's obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with the hearing procedure appears before him. This duty requires the ALJ to scrupulously and conscientiously probe into, inquire and explore for all relevant facts. The failure of the ALJ to develop an adequate record is not, however, ground for reversal per se. As in the case of hearing held without waiver of the right to counsel, the claimant must, in addition, show that she was prejudiced as a result of a scanty hearing. She must show that, had the ALJ done his duty, she could and would have adduced evidence that might have altered the result. If the plaintiff's subjective symptoms are linked to a medically determinable component, the ALJ is required to consider the symptoms and emotions of the claimant; it is the

16

duty of the ALJ to inquire further in the existence or nonexistence of distress sufficient to be disabling. The duty does not exact a lengthy hearing or protracted inquiry. It does exact a careful effort to make a complete record. <u>Kane v. Heckler</u>, 731 F.2d 1216, 1219-20 (5th Cir. 1984), and cases cited therein. Also, <u>Brock v. Chater</u>, 84 F.3d 726, 728 (5th Cir. 1996); <u>Carrier v. Sullivan</u>, 944 F.2d 243, 245 (5th Cir. 1991); <u>James v. Bowen</u>, 793 F.2d 702, 704 (5th Cir. 1986).

The ALJ has the duty to develop the relevant facts so that he can fully and fairly evaluate the case. <u>James</u>, 793 F.2d at 705. The court will reverse the decision of the ALJ as not supported by substantial evidence if the claimant shows (1) that the ALJ failed to fulfill his duty to adequately develop the record, and (2) that the claimant was prejudiced thereby. <u>Brock</u>, 84 F.3d at 728. Also, <u>James</u>, 793 F.2d at 704. <u>Brock</u>, 84 F.3d at 728.

In the case at bar, the ALJ relied on the fact that the unrepresented claimant did not make any legal arguments as to whether she met a listing, without making any further evaluation as to whether Elder actually meets a listing. Clearly, the ALJ failed to meet his heightened duty to Elder, because she was unrepresented, to "scrupulously and conscientiously probe into, inquire and explore for all relevant facts."

The court must now determine whether Elder can show prejudice arising from the ALJ's failure to fulfill his obligation to her.

1.

First, Elder argues that she meets Listing 5.05D. Listing

17

section 5.00 concerns the digestive system.  Listing 5.05D deals with chronic liver disease, as follows: "D. Hepatorenal syndrome as described in 5.00D(8), with one of the following: 1. Serum creatinine elevation of at least 2 mg/dL; or 2. Oliguria with 24 hour urine output less than 500 mL; or 3. Sodium retention with urine sodium less than 10 mEq per liter."  Listing 5.00D(8) states: "Hepatorenal syndrome (5.05D) is defined as functional renal failure associated with chronic liver disease in the absence of underlying kidney pathology.  Hepatorenal syndrome is documented by elevation of serum creatinine, marked sodium retention, and oliguria (reduced urine output).  The requirements of 5.05D are satisfied with *documentation of any one of the three laboratory findings on one evaluation.*"  (Emphasis added.)

The medical records show Elder's creatinine levels began to be elevated at or above 2.0mg/dL in October 2008.  Elder's creatinine levels were (Tr. pp. 336, 338, 388, 397, 463-466):

| Date | mg/Dl |
|------|-------|
| October 2, 2008 | 7.3 |
| October 3, 2008 | 3.9 |
| October 4, 2008 | 2.1 |
| November 7, 2008 | 2.3 |
| November 11, 2009 | 8.6 |
| November 12, 2009 | 5.1 |
| November 13, 2009 | 3.8 |
| November 14, 2009 | 3.1 |
| November 15, 2009 | 2.7 |
| November 16, 2009 | 2.7 |
| November 17, 2009 | 2.6 |
| November 18, 2009 | 2.5 |

It is apparent that Elder's creatinine elevation exceeded 2.0mg/dL on more than one examination, beginning on October 20, 2008; to meet the listing, Elder was required to show she met the

18

requisite elevation level on only one examination. Therefore, it is apparent on the face of this record that Elder meets Listing 5.05D.

Accordingly, Elder's appeal should be granted, the final decision of the Commissioner should be reversed, Elder should be found to be disabled pursuant to Listing 5.05D as of October 20, 2008, and disability insurance benefits should be awarded. This case should be remanded for calculation of that award.

2.

Elder also contends she meets Listing 5.06A, "Inflammatory bowel disease (IBD) documented by endoscopy, biopsy, appropriate medically acceptable imaging, of operative findings with: A. Obstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6-month period."

Elder contends she meets this listing because she has obstructive hydrophrenosis. However, Listing 5.06A deals exclusively with obstructions in the colon and small intestine, not the kidneys, ureter or bladder, which is where Elder had obstructive hydrophrenosis. Therefore, this argument is meritless.

3.

Elder contends she meets Listing 6.02C, "Impairment of renal function, due to any chronic renal disease that has lasted or can

19

be expected to last for a continuous period of at least 12 months.
with:... C. Persistent elevation of serum creatinine to 4 mg per
deciliter (dL) (100ml) or greater or reduction of creatinine
clearance to 20 ml per minute or less, over at least 3 months, with
one of the following:... 2. Persistent motor or sensory neuropathy
(see 6.00E4)."

From the Elders's highest creatinine levels in the record,
which are listed above, it is clear that Elder cannot show
continuous elevation of her serum creatinine to 4 mg/dL for at
least 3 months.  This argument is also meritless.

4.

Finally, Elder argues she meets Listings 9.08A and 9.08C,
"Diabetes mellitus.    With:   A.   Neuropathy demonstrated  by
significant and persistent disorganization of motor function in two
extremities  resulting  in  sustained  disturbance  of  gross  and
dexterous movements, or gait and station (see 11.00C); or... C.
Retinitis proliferans; evaluate the visual impairment under the
criteria in 2.02, 2.03, or 2.04."

The medical evidence shows Elder has diabetes mellitus and
neuropathy in both of her lower legs.  Listing 11.00C states, "C.
Persistent disorganization of motor function in the form of paresis
or paralysis, tremor or other involuntary movements, ataxia and
sensory disturbances (any or all of which may be due to cerebral,
cerebellar,  brain  stem,  spinal  cord,  or  peripheral  nerve
dysfunction)  which  occur  singly  or  in  various  combinations,
frequently provides the sole or partial basis for decision in cases

20

of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." There is no medical evidence in the record of sustained disturbance of gait or function in Elder's legs; Elder testified that she occasionally falls due to her neuropathy. Again, the record is not adequately developed as to the extent of Elder's locomotive impairment or interference with the use of her fingers, hands and arms, if any, due to peripheral neuropathy. A medical source statement or consultative neurological exam would have filled in this gap and been helpful and provided medical evidence from which the ALJ could determine whether Elder meets Listing 9.08A.

Elder also contends she has retinitis proliferans. According to the National Eye Institute, diabetic eye disease may include diabetic retinopathy, cataract, and glaucoma. Retinitis proliferans, or proliferative retinopathy occurs when fragile, abnormal blood vessels develop and leak blood into the center of the eye, blurring vision. Proliferative retinopathy is the fourth and most advanced stage of the diabetic retinopathy. See National Eye Institute, "Facts About Diabetic Retinopathy," *available at* http://www.nei.nih.gov/health/diabetic/retinopathy.asp (a service of the U.S. National Library of Medicine and the National Institutes of Health).

The only eye examination in the administrative record is from 2006 and it showed "no evidence of diabetic retinopathy in either eye" (Tr. p. 207). However, Elder testified she had an eye exam

21

scheduled at the Wallace Eye Center in January 2010, the same month as her administrative hearing. Since the ALJ apparently did not leave the administrative record open for inclusion of that medical record and/or did not request that record from the Wallace Eye Center, he failed to fully develop the administrative record. However, since there is no evidence in the record that indicates Elder has diabetic retinopathy (though she has cataracts), Elder cannot show prejudice arising from the ALJ's neglect.

This ground for relief is meritless.

Issue 3 - Elder's Credibility

Next, Elder contends her allegations as to her symptoms were improperly rejected without a proper assessment of credibility as required by the regulations. Elder also contends the ALJ failed to inquire whether Elder was noncompliant with her insulin because she could not afford it.

Although a claimant's assertion of pain or other symptoms must be considered by the ALJ, 42 U.S.C. § 423(d)(5)(A) requires that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged. The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence. Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989), citing Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985). The factual determination of whether the claimant is able to work despite some pain is within the discretion of the Administrative Law Judge and will be upheld if

22

supported by substantial evidence. <u>Fortenberry v. Harris</u>, 612 F.2d 947, 950 (5th Cir. 1980).

A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §404.1529(c)(4). Subjective complaints of pain must be corroborated by objective medical evidence. <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2000). Although severe pain can constitute a nonexertional impairment, pain is a disabling condition only when it is constant, unremitting and wholly unresponsive to therapeutic treatment. <u>Chambliss</u>, 269 F.3d at 522.

While pain can be severe enough to create a disabling condition, the evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. <u>Elzy v. Railroad Retirement Bd.</u>, 782 F.2d 1223, 1225 (5th Cir. 1986); <u>Loya v. Heckler</u>, 707 F.2d 211, 215 (5th Cir. 1983). The ALJ's decision on the severity of pain is entitled to considerable judicial deference. <u>James v. Bowen</u>, 793 F.2d 702, 706 (5th Cir. 1986); <u>Jones v. Bowen</u>, 829 F.2d 524, 527 (5th Cir. 1987). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. <u>Falco v. Shalala</u>, 27 F.3d 162, 163-64 (5th Cir. 1994).

23

The ALJ made the following findings as to Elder's pain and credibility (Tr. pp. 21):

> "The claimant stated that she has chronic pain in her legs and feet. Her legs give out occasionally which causes her to fall. She also has occasional problems with her hands and pain in her forearms.
>
> *     *     *
>
> "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> *     *     *
>
> "In terms of the claimant's alleged impairments, the undersigned concludes that the objective medical evidence fails to support the claimant's subjective complaints of total inability to perform substantial gainful activity. The claimant's diabetes mellitus is able to be controlled with proper diet and medication compliance. However, the claimant has admitted on multiple occasions to being non-compliant with her medication. She has indicated at times that she is only taking her diabetes medications only once a week or once every two weeks. While the claimant may have some diabetic neuropathy of her lower extremities, there is no indication in the medical records which shows that she would be unable to perform light work activity."

First is noted that, the ALJ's statement that Elder "*may* have some diabetic neuropathy of her lower extremities" is at odds with his conclusion that neuropathy is one of Elder's severe impairments. The fact that Elder has peripheral neuropathy[10] in her lower legs is conclusively established by the medical records

---

[10] Peripheral neuropathy, the most common type of diabetic neuropathy, causes pain or loss of feeling in the toes, feet, legs, hands, and arms. National Diabetes Information Clearinghouse, "Diabetic Neuropathies: The Nerve Damage of Diabetes," *available at* http://diabetes.niddk.nih.gov/dm/pubs/neuropathies/ (A service of the National Library of Medicine and the National Institutes of Health).

before this court and the ALJ's statement that Elder "may" have some neuropathy of her lower extremities is not supported by substantial evidence. The ALJ appears to be making his own inexpert medical conclusion in stating she "may have" some neuropathy. ALJs have been warned by the courts against "playing doctor" and making their own independent medical assessments. Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2002). Therefore, the ALJ's finding that Elder's possible neuropathy does not preclude all work activity is not supported by substantial evidence.

Next, the ALJ stated several times in his decision that Elder had been non-compliant with her medications, and the record reflected that she did not take her insulin as prescribed. If a claimant does not follow the prescribed treatment without a good reason, she will not be found disabled. 20 C.F.R. § 404.1530(b). An example of a good reason for not following treatment is that surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment. 20 C.F.R. § 404.1530(c)(3). Therefore, Elder's failure to take her insulin as prescribed may preclude a finding of disability due to her uncontrolled diabetes. However, although Elder's uncontrolled diabetes caused the neuropathy in her legs, her acute renal failure, and her cataracts, they are separate diseases/impairments from her diabetes; even if Elder manages to control her diabetes, her neuropathy, renal failure, and cataracts will still exist and require separate medical treatment. Therefore, to the extent the ALJ may have been influenced by the fact that Elder is non-

25

compliant with taking her insulin as prescribed, that rationale is inapplicable to the limitations caused now by Elder's peripheral neuropathy, acute renal failure, and cataracts.

Elder contends the ALJ failed to inquire whether she was noncompliant with her medication due to inability to pay for it; Elder testified that she did not have any money or property, and the she had to live with her sister. Inability to pay for treatment is a good reason for a refusal to follow prescribed treatment. Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984), citing Social Security Ruling 82-59. Also, Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987). Therefore, the ALJ failed to fully develop the record in this instance, also.

Finally, the ALJ's statement that Elder's diabetes mellitus is able to be controlled with proper diet and medication compliance is unsupported by the record, fails to take into account Elder's severe diabetic complications, and is, again, the ALJ's own non-expert medical conclusion.

The medical evidence does not indicate to what extent Elder's cataracts, peripheral neuropathy, and acute renal failure (particularly the fact that she has to wear a catheter all of the time) preclude work activity. Although there is one residual functional capacity assessment, on which the ALJ relied, it was completed in 2006 (before Elder developed renal failure and had to start wearing a catheter) by a pediatrician. A current residual functional capacity assessment by a relevant medical doctor or medical source statements (20 C.F.R. § 404.1513(b)(6)) would have

aided the ALJ in making findings as to Elder's residual functional capacity and would have properly supported those findings. As it stands, no medical evidence supports the ALJ's determination that Elder's severe impairments do not prevent her from performing light work.

Accordingly, the ALJ's/Commissioner's findings as to Elder's residual functional capacity are not supported by substantial evidence.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that Elder's appeal be GRANTED, the final decision of the Commissioner be REVERSED, and that Elder be found disabled pursuant to Listing 5.05D as of October 20, 2008 and disability insurance benefits awarded. Accordingly, IT IS RECOMMENDED that this case be remanded to the Commissioner for the calculation and payment of disability insurance benefits.

ALTERNATIVELY,

IT IS RECOMMENDED that Elder's appeal be GRANTED, the final decision of the Commissioner be VACATED, and Elder's case be REMANDED to the Commissioner for full and fair development of the administrative record, to include new medical evidence, medical source statements and/or consultative exams, and reconsideration of Elder's applications for benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific,

written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

   **A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen (14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

   THUS DONE AND SIGNED at Alexandria, Louisiana, on this 29th day of February 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE